UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


XIAO HONG LIU, et al.,          *     Case No. 15-CV-5184(AMD)
 *on behalf of themselves*       *
 *and others similarly*          *
 *situated,*                     *
                                *
                Plaintiffs,     *     Brooklyn, New York
                                *     May 31, 2017
     v.                         *
                                *
VMC EAST COAST, LLC, et al.,    *
                                *
                Defendants.     *
                                *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *

        TRANSCRIPT OF CIVIL CAUSE FOR EVIDENTIARY HEARING
             BEFORE THE HONORABLE ROBERT M. LEVY
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:          KIBUM BYUN, ESQ.
                             JOHN TROY, ESQ.
                             Troy Law, PLLC
                             41-25 Kissena Blvd.
                             Suite 119
                             Flushing, NY  11355


For the Defendants:          KEVIN K. YAM, ESQ.
                             Xue & Associates, P.C.
                             1001 Avenue of the Americas
                             11th Floor
                             New York, NY  10018



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.


**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

1           (Proceedings commenced at 3:12 p.m.)

2           THE COURT:  This is Docket No. CV-16-5184, Liu v.

3    VMC East Coast, LLC.

4           Will counsel please state their appearances for the

5    record?

6           MR. BYUN:  Good afternoon, Your Honor.  This is

7    Kibum Byun, of Troy Law, for plaintiffs.  And this is Mr. John

8    Troy from Troy Law.  He's also plaintiff's counsel in this

9    case.

10          THE COURT:  All right.  And who else is with you at

11   counsel table?

12          MR. BYUN:  Sitting next to Mr. Troy is Ms. Tiffany

13   Troy.  She came as a paralegal for us, and she's

14   (indiscernible) clerk at our office, Your Honor.

15          THE COURT:  And the gentleman?

16          MR. BYUN:  His name is Mr. Arthur Quock (ph).  He's

17   a interpreter for a witness here.

18          THE COURT:  Thank you.

19          MR. YAM:  Good afternoon, Your Honor.  My name is

20   Kevin Yam from the law firm of Xue & Associates.  I represent

21   defendant and third-party defendant, Shiu Leung and her

22   corporation, Superworld Express Corp.

23          And to her left is Ms. May Cindy Low who is a

24   witness to this -- today's proceedings.  She witnessed,

25   basically, the events that led to today's motion for

3

1    disqualification.

2              THE COURT:  All right.  So, you're prepared to

3    present some witnesses at this time.

4              MR. YAM:  Yes.  Okay.  So, you want to start with

5    Ms. Shiu?

6              MR. BYUN:  No, before Ms. Leung testify, plaintiff,

7    pursuant to Federal Rule of Evidence, 6615, we request Ms. Low

8    from excluding while Ms. Leung testify.

9              THE COURT:  You can place her in the witness room.

10             MR. BYUN:  Your Honor, from plaintiff, before

11   defendants begin their directing of their witness, plaintiff

12   would ask to put on the record that plaintiff had requested a

13   production of documents; basically, all evidence that they

14   have been submitted, and they intend to use for today's

15   purposes to bring an original copy, or original version of it

16   to this hearing so plaintiff have chance to inspect those

17   evidence.

18             And defense counsel had indicated to us that they

19   could not bring those original version to us -- to here, Your

20   Honor.

21             MR. YAM:  Well, the copies of the original documents

22   were submitted via ECF.  I have paper copies of the original

23   documents.

24             MR. BYUN:  Your Honor --

25             MR. YAM:  If I might finish?  I was going to present

Leung - Direct                                                    4

1    each document as we proceed with the direct examination of my

2    client.

3              MR. BYUN:  Just to bring attention, we're

4    specifically asking for Docket No. 55-2.  It was Exhibit A

5    that was attached to the reply memo.

6              It's a poor copy of what it appears to be a Chinese

7    newspaper advertisement of Mr. Troy.  This is only a portion

8    of newspaper.  I believe this is very small portion and it's

9    not -- I don't think it can be entered into evidence, Your

10   Honor.

11             THE COURT:  Well, I think it's premature at this

12   point.  It hasn't even been offered.

13             MR. BYUN:  Yes, sir.

14             THE COURT:  You'll have an opportunity to object at

15   the time.

16             MR. BYUN:  Thank you, Your Honor.

17             THE CLERK:  Sir, please state your name and the

18   language you're interpreting for the record.

19             THE INTERPRETER:  Yes.  Arthur Quock (ph),

20   Cantonese.

21             THE CLERK:  Thank you.  Please raise your right

22   hand.

23         (The interpreter is sworn.)

24            SHIU LEUNG, DEFENDANT'S WITNESS, SWORN

25         (Testimony through a Cantonese interpreter.)

Leung - Direct                                              5

```
 1              THE CLERK:  Thank you.  Please state your name for
 2    the record.
 3              THE WITNESS:  My name is Shiu Leung.
 4              THE CLERK:  Thank you.
 5          (Pause.)
 6                        DIRECT EXAMINATION
 7    BY MR. YAM:
 8    Q    So, Ms. Leung, I'm your attorney in this matter.  I will
 9    just start with some background information.
10    A    Yes.
11    Q    Okay.  So, you're the -- are you the president of
12    Superworld Express Corp.?
13              MR. BYUN:  Objection, leading.
14              THE COURT:  Overruled.
15              THE WITNESS:  Yes.
16    BY MR. YAM:
17    Q    When did you first hear about the lawsuit against you and
18    Superworld Express Corp., namely this action, 16-CV-5184?
19    A    What case are you referring to?  What case?
20    Q    The minimum wage overtime lawsuit against you, adding you
21    as third-party defendants, as well as defendants.
22    A    March, this year.
23    Q    2017, correct?
24    A    Yes.
25    Q    Okay.  Can you tell me what you know about the defendant
```

Leung – Direct                                    6

1    and third-party plaintiff, VMC East Coast, LLC, Mark Tran and

2    Glenn Ledet?

3    A    Well, at one point I helped them facilitate to get some

4    bus company, office space, and to get the bus line so that it

5    could go to the casino.  The casino line.

6    Q    So, was there a contractual relationship between

7    Superworld Express Corp., you, and VMC East Coast, and the two

8    individual defendants, Mark Ledet -- Mark Tran and Glenn

9    Ledet?

10   A    Yes.

11            MR. YAM:  Introduced as Exhibit A, services

12   agreement between VMC and Superworld Express Corp.

13            MR. BYUN:  Where is my copy?

14            MR. YAM:  Do you guys have the exhibit tabs or --

15            THE COURT:  We do.

16            MR. YAM:  Okay, great.

17            THE COURT:  And so, this is marked as Defendant's

18   Exhibit 1 for identification.

19       (Defendant's Exhibit No. 1 was marked for

20   identification.)

21            THE COURT:  All right.

22            MR. YAM:  Okay.

23   BY MR. YAM:

24   Q    Can you briefly tell me about what you -- what kind of

25   agreement you entered into with VMC by signing this agreement

Leung - Direct                                        7

1      on May 13, 2015?

2              MR. BYUN:  Objection, lack of foundation.

3              THE COURT:  Sustained.

4      BY MR. YAM:

5      Q    So, this services agreement is an agreement signed

6      between Superworld Express Corp. and VMC East Coast, LLC on

7      May 13th, 2015.

8              MR. BYUN:  Objection, that's leading.  He's

9      explaining the evidence to his witness.

10             THE COURT:  All right.  But this is a hearing.  I'll

11     allow it.

12             MR. YAM:  She doesn't --

13             THE COURT:  Don't -- excuse me, don't respond to

14     him, respond to the Court.

15             MR. YAM:  Sorry, Your Honor.

16     BY MR. YAM:

17     Q    So, can you take a look at this document?

18          (Pause.)

19          Based on this agreement, what was the basic terms?

20             MR. BYUN:  Objection, lack of foundation.

21             THE COURT:  Overruled.

22             THE WITNESS:  VMC kept the line from the company --

23     meaning Mohegan Sun, the bus -- the bus line.

24             THE COURT:  Could you ask her to identify what this

25     agreement is?

1    BY MR. YAM:

2    Q    Can you tell me what this agreement is in basic terms?

3    What were you to perform and what was VMC to perform?

4    A    So, VMC got this line, the Mohegan Sun line.  But they

5    need somebody, they need people, and they are based out of

6    California.

7         And they need people, East Coast people to facilitate or

8    find bus companies for them, including office space so that

9    tickets could be sold and they need basically a middle person

10   to communicate, facilitate with people.

11   Q    And how long, from May 13th, 2015, how long did this

12   relationship with VMC last for?

13             MR. BYUN:  Objection, he's assuming the fact that's

14   not in the evidence, Your Honor.

15             THE COURT:  Is this contract between you and VMC?

16             THE WITNESS:  Yes.

17             THE COURT:  Did it create a relationship with VMC

18   that began -- did it create a relationship with you and VMC?

19             THE WITNESS:  Yes.

20             THE COURT:  And for what period of time did that

21   relationship last, this contract?

22             THE WITNESS:  From June 1st, 2015 until May 31st,

23   2016.  And they canceled this unilaterally.  Originally, this

24   agreement was in -- forever.  Forever.  Perpetual.

25   BY MR. YAM:

Leung – Direct                                      9

1   Q    Okay, I'm going to introduce an exhibit -- this is a

2   termination letter dated August 29th, 2016.

3        So, on August 29th, 2016, Superworld Express Corp.

4   received a termination letter stating that VMC will terminate.

5            MR. BYUN:  Objection.  Objection, Your Honor.

6   Defense counsel again is explaining what the evidence is to

7   his witness.

8            MR. YAM:  I'm describing the documents.

9            THE COURT:  Ask her to describe the document.

10           MR. YAM:  Okay.

11           THE COURT:  How is this -- okay, go ahead.

12  BY MR. YAM:

13  Q    Okay.  Can you just take a brief look at this document?

14           THE COURT:  Can she read it?

15           MR. YAM:  No, that's why I was just (inaudible).

16           THE COURT:  Then how can she authenticate it?

17           MR. YAM:  Because she's able to understand some

18  English, but not all of it.

19           THE COURT:  Ask her if she knows what the document

20  is and to explain it.

21           THE WITNESS:  Yes.

22  BY MR. YAM:

23  Q    Sue, you know what this document is?

24  A    Yes.

25  Q    Okay.  So, after you received this letter --

Leung - Direct                                    10

1          MR. BYUN:  Objection.  Lack of foundation.  He

2     failed to establish authenticity of this document, Your Honor.

3          THE COURT:  Can she identify what the document is?

4     BY MR. YAM:

5     Q    The document is a termination letter.  Can you identify

6     what the document is?

7     A    It's a suspension letter terminating my service, dated

8     August 29, 2016.  Terminating my consultation, consulting

9     service.

10    Q    Okay.  After you received this letter, what was your --

11    what were you thinking?

12    A    Well, I felt that VMC again and again canceled me, so I

13    was thinking of getting counsel; getting a lawyer.

14    Q    And then, how did you proceed to obtain counsel?

15    A    And then in the middle of September I started searching

16    Chinese newspapers.  And I subscribed to the *Sing Tao*

17    newspaper.  Occasionally, I also buy the *World Journal*

18    newspaper.  So, I was searching for attorneys in the

19    newspapers.

20         However, mainly, I was looking for a contingent -- a

21    contingency attorney.

22         And I phoned several different attorneys because I wanted

23    to listen to what different attorneys had to say.  And I

24    proceeded to make several phone calls to several different

25    attorneys.

Leung - Direct                                    11

1         Some said that they don't do any commercial --

2                THE COURT:  Just tell us, did there come a time when

3    you spoke to John Troy?

4                THE WITNESS:  Yes.  Yes.  I phone his office and I

5    make an appointment to meet.  I make two appointments, and one

6    of them was Attorney Troy.  And I went up to see Attorney Troy

7    around September 23rd.

8    BY MR. YAM:

9    Q    And did you go with anyone on September 23rd, 2016?

10               THE COURT:  You said September 23rd.  What year was

11   that?

12               THE WITNESS:  2016.  2016.

13               MR. YAM:  I had a question.

14               THE INTERPRETER:  What's your question?

15   BY MR. YAM:

16   Q    Oh, did you go with anyone else when you went to see Mr.

17   Troy on September 23rd, 2016?

18   A    I did.  I invited Cindy to accompany me.

19   Q    And who is Cindy?

20   A    Cindy is a tour guide of Mohegan Sun in the past.

21   Q    When you arrived at the office, what happened?

22   A    I met Attorney Troy.  I brought along all the documents

23   with me, and all the appointment attorneys wanted some

24   documents, so I brought along the documents and went out to

25   see Attorney Troy.

1          And I told him that because of VMC's termination of the

2     commercial, I wanted to hire counsel.  And I showed him the

3     documents.

4     Q     What did you guys discuss?

5     A     I wanted to know whether he can represent me and start a

6     lawsuit because I have been terminated.  My consultantcy (sic)

7     and a suspension, the termination letter.

8     Q     Did Mr. Troy ask you about any of the relevant parties

9     with respect to this agreement?

10          MR. BYUN:  Objection, lack of -- there's, you've got

11    to define the relevant party.

12    BY MR. YAM:

13    Q     Okay.  So, this agreement -- what agreement are you

14    talking about?

15    A     Actually, both.

16    Q     Can you describe what that is?

17          THE COURT:  Exhibit 1?

18          THE WITNESS:  Yes.

19          THE COURT:  Exhibit 1?  And 2.

20          THE WITNESS:  One and two.

21    BY MR. YAM:

22    Q     Right.  So, what did you talk about these documents with

23    Mr. Troy?

24    A     Well, I told him about the document and he said, well, at

25    the moment I am representing two tour guides, suing them.  And

1   then I said, if you are representing two tour guides, and if

2   you represent me, would that be conflict of interest?

3   Q    And what did Mr. Troy say?

4   A    He said no.  Definitely no, because he said that I'm a

5   broker, I'm a middleman.  And I'm only the middleman so that's

6   why.  No.

7        And then he emphasized and told me, now that you come up

8   here, did I first find out your existence and the existence of

9   Superworld.

10       So, I definitely cannot pull you in.  And he spoke in

11  Mandarin and said  cannot -- won't be or cannot pull you in,

12  drag you in -- into the case.  And, I felt very at ease and

13  then I continued to have the discussion; continue the

14  discussion.

15       I trusted him at that point, so I told him all the

16  situation involving myself, VMC, the tour guides, because he

17  asked me whether I know those two tour guides.  And then we

18  had discussions about how to proceed with the lawsuit, and

19  then Attorney Troy said it's fine, it's good.

20       And then I asked him whether it's true if the lawsuit --

21  if we cannot win the lawsuit, then he won't charge fees.

22  Attorney Troy said to me that part of it have to be paid for,

23  and he said maybe several thousand or about 10,000.  And in my

24  mind I thought that I would have to pay only if I win.  So,

25  that's why I said I would consider -- think about it.  So,

1    that's what happened that day.

2              THE COURT:  When you said, you had discussions with

3    Mr. Troy about how to proceed with the lawsuit, were you

4    referring to the lawsuit that you wanted to bring against VMC?

5              THE WITNESS:  Yes.

6              THE COURT:  And have you now described the full

7    extent of your conversations with Mr. Troy on that first

8    meeting?

9              THE WITNESS:  Well, Attorney Troy was looking at

10   documents, we were having conversation back and forth, looking

11   at the document, discussions about the document.

12             THE COURT:  And when you say documents, you're

13   referring to Exhibit 1 and 2?

14             THE WITNESS:  So, when I had the discussion with

15   Attorney Troy there was a whole stack of documents and our

16   discussion revolved around bringing lawsuits against VMC.

17             THE COURT:  When you say a whole stack of documents,

18   what documents were those?

19             THE WITNESS:  VMC tickets, these two documents, a

20   whole stack of stuff.  Attorney Troy only looked at maybe just

21   these two documents, and he felt that they're sufficient for a

22   lawsuit.

23             THE COURT:  Did you discuss anything else with Mr.

24   Troy on that date?

25             THE WITNESS:  And then because we talked about suing

1    VMC, that's how he find out about Cindy.  Cindy, later on.

2    And then he said that he is a tour guide, and then discuss

3    about --

4            THE COURT:  He said who was a tour guide?

5            THE WITNESS:  Cindy.

6            THE COURT:  Cindy?  She is the tour guide?

7            THE WITNESS:  After Attorney Troy find out that she

8    was a tour guide and then he continued the discussion with her

9    in terms of how to also sue VMC.

10           THE COURT:  Did you have any further discussions

11   with -- did you discuss anything else with Mr. Troy at that

12   time?

13           THE WITNESS:  Yes, we discuss about how I started

14   the relationship with VMC, how I started, and how then how did

15   they pay in terms of payroll.  And then I said -- okay, and

16   then I told him, K&F is the payroll company who paid the

17   salary.

18           We did have extensive discussion that day, but

19   generally around how I felt, everything about how to sue VMC

20   and the relationship between myself and VMC.

21           THE COURT:  And again, when you say the

22   relationship, are you referring to these two documents,

23   Exhibit 1 and Exhibit 2?

24           THE WITNESS:  Yes, generally, yes.

25           THE COURT:  And what did you tell Mr. Troy about K&F

Leung – Direct                                               16

1   and the salary that VMC paid?

2        THE WITNESS:  I said to him, K&F is responsible for

3   the payroll, and I have to check revenue from VMC on a daily

4   basis and verify them with the tour guides to make sure, the

5   figures, or the dollar amount, accurate, and then report to

6   VMC.  Verify.

7        Attorney Troy then said, you are only the middle-

8   man, you are a broker.

9        THE COURT:  What figures did you verify, did you

10  tell Mr. Troy that you verified?

11       THE WITNESS:  Well, each day the money collected in

12  the envelope by the tour guide has to be given to K&F, and the

13  tour guides would have an app -- application, that reports to

14  VMC.  That's given by VMC.

15       So, I have to verify whether the number of people

16  reported by the tour guide matches the number provided by VMC.

17       THE COURT:  So, is the money you're referring to

18  that was collected by the tour guides, money that was

19  collected from passengers on the bus?

20       THE WITNESS:  Some are -- some are from the two

21  offices of VMC, the sales proceeds.

22       THE COURT:  So, what money -- what were you

23  verifying when you were reporting the money to VMC?

24       THE WITNESS:  Number of people and the money

25  collected by the tour guide, and by K&F, to match the app on

Leung – Direct                                            17

1    the VMC report.

2            THE COURT:  So, are you saying -- when you refer to

3    people, are you saying passengers?  The number of passengers

4    on the bus?

5            THE WITNESS:  Passengers, yes.

6            THE COURT:  And are you saying it was your job to

7    verify that the tour guides gave VMC all the money that was

8    collected from passengers?

9            THE WITNESS:  (In English) Not to VMC, to K&F.

10           THE COURT:  To K&F.

11           THE WITNESS:  (In English) And match (inaudible).

12           THE INTERPRETER:  Do you understand?

13           THE COURT:  Yes.

14           MR. YAM:  Do you need a clarification?  Do you want

15    her to just to say it one more time?

16           THE COURT:  No, I think -- well, so what was the

17    purpose?  Why were you doing this?

18           THE WITNESS:  Because what K&F collected, including

19    the tickets that they sell, and also the money collected by

20    the tour guide, and then the tour guide report to VMC.  VMC's

21    app.

22           (In English) Yeah, they have a special app.  Tour

23    guide must report it.

24           MR. YAM:  Do you want me to ask her more specific

25    questions?

Leung – Direct                                    18

1           THE COURT:  Sure.

2           MR. YAM:  Okay.

3           THE COURT:  Well, again, I just want to know what

4    she discussed.

5           MR. YAM:  Okay.

6           THE COURT:  Is what she -- you want to make a

7    proffer at this point?  She's discussing a verification that

8    the tour guides made sure that all the money that was

9    collected was given to the proper person.  In other words to

10   K&F or to VMC?

11          MR. YAM:  I think that's part of what she's trying

12   to say; verification fo what's given to the tour guide.

13          THE COURT:  In other words, the tour guide didn't

14   keep any of this money, correct?

15          MR. YAM:  Can you translate?

16          THE WITNESS:  Yes.  The return are given to K&F.

17          THE COURT:  All right.  So, none of this money was

18   kept by the tour guides?

19          THE WITNESS:  Yes, correct.

20   BY MR. YAM:

21   Q    On September 23rd, 2016, at that first meeting, did Mr.

22   Troy know about Superworld Express Corp., your company?

23          MR. BYUN:  Objection, leading.

24          THE COURT:  Overruled.

25          THE WITNESS:  He said he was not aware.  That's why

Leung - Direct                                    19

1     he said that now that you are here, do I know that you exist?

2     Do I know that Superworld exists, and that's why?  Definitely,

3     you're not going to be sued.

4     BY MR. YAM:

5     Q    So, your testimony is that on September 23rd, 2016, he

6     knew of the existence of Superworld Express Corp.?

7           MR. BYUN:  Objection, leading.  That's a

8     mischaracterization of witness testimony.

9           THE COURT:  Just ask her what she -- I don't think

10    we need to know that.  She said she worked with Superworld.

11    Obviously, if they had a meeting, she told him where she

12    worked.

13    BY MR. YAM:

14    Q    And how long did this meeting last for on September 23rd,

15    2016?

16    A    About an hour or so, because it was back and forth, back

17    and forth, a lot of talking.  About an hour, hour and a half,

18    hour and a half.

19    Q    Okay.  What was the second time you met with Mr. Troy?

20    A    October 8th.

21    Q    How do you remember so sure?

22    A    Several days after the meeting, after September 23rd,

23    Cindy called me and informed me -- informed me that Attorney

24    Troy said that if we still want to bring the lawsuit we should

25    go to him.

1          So, then I call his office again to make another

2     appointment.  I remember October 8th very clearly because it

3     was a Saturday that day.

4     Q    Around what time did you meet Mr. Troy on October 8th,

5     2016?

6     A    The appointment was for 1:30.

7     Q    Was anyone else present as his offices?

8     A    His office?  Yes, there was a lady, a girl, outside, by

9     the reception area.  And I didn't pay particular attention

10    whether anybody was sitting on the other two chairs or not.

11    Q    Did you bring anyone else on that date, October 8, 2016?

12    A    Yes, Cindy went with me because they invited both of us

13    to go.

14    Q    Who's "they invited us"?

15    A    Attorney Troy informed one of the original plaintiff to

16    talk to us and said if we want -- if we still want to bring

17    the lawsuit, to come contact him; to go to him.  And that's

18    the reason both of us went up to see him.

19    Q    What was discussed at this October 8th meeting?

20    A    I don't know whether it was the wi-fi that was broken or

21    the computers that was broken at Mr. Troy's office that day.

22    He couldn't open the file of what we had discussed last time,

23    and he asked me to retell the whole thing to him.  And then he

24    said, definitely, I can bring the lawsuit and no conflict of

25    interest.

Leung - Direct                                    21

1        So, we felt at ease because he said he won't sue us.  So,

2   we again recounted what had happened; retold what had

3   happened.

4            THE COURT:  Did you tell him anything -- did you

5   provide any more information than you did during the first

6   meeting with Mr. Troy?

7            THE WITNESS:  Same material.

8   BY MR. YAM:

9   Q    How long did that meeting last on October 8th?

10  A    One hour, because it took a while to fix, fiddling around

11  with the computer, and also plus the whole thing had to be

12  retold, recounted again because he was unable to open the

13  records from the previous meeting.

14       And then I asked him at that time, is it true that if we

15  don't win, then no fee charged, right?  Because he was the one

16  who asked me to go again, to come again.  However, he said no,

17  have to pay, you have to pay.  Have to pay a few thousand,

18  10,000, or no more than 10,000.

19       And I heard that -- and then when I hear that money has

20  to be paid, and then I said, let me think about this.  And let

21  me see if I can find some other attorney who would be free on

22  a contingency.

23            MR. YAM:  Okay.  Now, I want to introduce an audio

24  between Ms. Leung and Mr. Troy.  This audio was produced on or

25  around March 14th, 2017.

Leung – Direct                                          22

1            The audio was sent to Troy's offices.  It's on my

2     cell phone.  I don't have a thumb drive, but if Your Honor

3     would like the –– this is a copy (inaudible). But at least for

4     the purposes of today's hearing, the interpreter can listen to

5     this and translate it, but ––

6            THE COURT:  Do you want to make a proffer as to what

7     it says?

8            MR. YAM:  It's basically communication between Ms.

9     Leung and Mr. Troy regarding their previous conversation.

10    This is about a two-minute video.  Audio.

11           THE COURT:  What is the purpose?

12           MR. YAM:  Basically, it states that they talk about

13    what happened during the last two conversations, what they

14    talked about, and then Ms. Leung basically –– do you remember

15    me?  And Mr. Troy is like, oh, now I have a conflict of

16    interest and now I can't represent you.

17           THE COURT:  Do you recall what she said?

18           MR. YAM:  Yes.  Basically she says that, Mr. Troy,

19    do you remember me?  I'm Sue from Superworld.

20           And Mr. Troy automatically knows who Sue and

21    Superworld is.

22           MR. TROY:  Objection, Your Honor.

23           MR. BYUN:  Objection.  We inspected all the records

24    today and it's quite different from what Mr. Yam just

25    described.

Leung - Direct                                  23

1              THE COURT:  I just want to know --

2              MR. TROY:  They never mentioned --

3              THE COURT:  Mr. Troy.  Mr. Troy.  Mr. Troy and --

4    okay.  Please, don't speak to counsel, don't speak to the

5    witness.  If you want to make an objection, say objection, but

6    that's not proper conduct.

7              I just want to know what your version of the tape

8    is; the version most favorable to you.  And that

9    essentially --

10             MR. YAM:  It shows that Mr. Troy acknowledges these

11   two meetings, that they met and discussed in detail about the

12   relationship between Superworld, VMC, and Mr. Troy, contrary

13   to what he states in his papers, his opposition, that he

14   doesn't even know about Superworld's existence until the

15   third-party complaint, that's absolutely false.

16             He knew about Superworld, and once Superworld and

17   Sue was mentioned, he knew exactly who they were.

18             If I may introduce the audio?  Or --

19             THE COURT:  Well, we don't have a transcript.

20             MR. YAM:  Okay.

21             THE COURT:  Are you going to have the interpreter

22   interpret it?

23             MR. YAM:  Can we do that?

24             THE COURT:  I don't think the interpreter is going

25   to be able to do that.

1            THE INTERPRETER:  It would take two hours.

2            MR. YAM:  It would take two hours?  Okay.  Then, if

3     Your Honor would require it, I can produce it.  Yeah, I can --

4            THE COURT:  Yeah, you can produce the transcript.

5            MR. YAM:  I can produce the transcript.

6            THE COURT:  All right.  I mean, the parties disagree

7     as to what's in the transcript, and you all have that

8     disagreement.  I don't think playing it is going to make it

9     more accurate.

10           MR. YAM:  Okay, great.  So, now I have no further

11    questions for Ms. Leung at this moment.

12           THE COURT:  Actually -- all right.  That's fine.  Go

13    ahead.

14                       CROSS-EXAMINATION

15    BY MR. BYUN:

16    Q    Good afternoon, Ms. Leung.  My name is Kibum Byun.  I

17    represent plaintiffs in this action and I have some questions

18    about your testimony you just made.

19           Earlier, you testified that you seeked (sic) attorney

20    after you receive what is called a cancellation letter, or a

21    termination letter from VMC.  Is that correct?

22    A    Yes.

23    Q    And it was your testimony that you called several

24    attorneys after you had received a termination letter from

25    VMC.  Is that correct?

1    A    Yes.

2    Q    How many attorneys did you call to -- in the process of

3    locating an attorney --

4                THE COURT:  I'm sorry to interrupt you, but in the

5    interest of efficiency, I don't think the issue here is going

6    to be how many attorneys she spoke to.

7                I think the issue will be what the substance of her

8    conversations was with Mr. Troy, unless there's a reason to

9    get into these other details.

10               MR. BYUN:  Sure.  Yes, Your Honor.

11   BY MR. BYUN:

12   Q    Ms. Leung, earlier you testified that you made

13   appointments.  Actually, you testified, two appointments to

14   see Mr. Troy, correct?

15   A    Yes.

16   Q    How did you make the appointment?

17   A    I called the phone number that's on the newspaper.  I

18   called Mr. Troy's office, and the lady, or the girl on the

19   other end of the phone took my name, my phone number, and

20   synopsis of what happened, and made the appointment for me.

21   Q    How did you find out about Attorney John Troy?

22   A    From Chinese newspaper.  But when I went up there he

23   informed me two tour guides were involved in the lawsuit.  And

24   I remember at that point that previously one of the tour

25   guides had mentioned Attorney Troy.

1        And I didn't pay particular attention.  I didn't remember

2   until when I went up there and he told me he represent two

3   tour guides.   And that's why I remember I heard his name

4   previous.

5   Q    What were the names of those tour guides you just

6   mentioned?

7   A    Well, we call them by their English names, but at the

8   time Attorney Troy called them their Chinese name.  Wong Way

9   Yin (ph).  And then he said the other person is Liu Chao Hon

10  (ph).  And I only know Lee, Liu, and Wong (ph).

11  Q    I'm very confused.  Asking to clarify, was that your

12  testimony that one of those two bus tour guides informed you

13  about Mr. Troy, or John Troy, before you went to see him at

14  his office?

15  A    Yes.  Yes.  Liu informed me that now I have retained or

16  found an attorney on contingent basis.  If no win, no payment

17  and mentioned the name.

18       So, I was not trying to remember that because at that

19  point I still haven't received my letter yet.  I wasn't

20  prepared to bring any lawsuit at that point.

21       I only remember that matter after I went up and visited

22  him.

23  Q    Did that individual tell you about John Troy, Attorney

24  John Troy, in person or by telephone?

25            THE COURT:  Is that necessary?  I mean --

Leung - Cross                                              27

1           MR. BYUN:  Yes.  I find it necessary.

2           THE COURT:  All right.  Because -- all right.

3           MR. YAM:  Your Honor, I don't think it's necessary.

4     All we need to talk about is the substance of the

5     conversations.

6           THE COURT:  You don't need a trial on this issue.

7           MR. BYUN:  There is an issue about the timing of

8     when she got to know about Mr. Troy.

9     BY MR. BYUN:

10    Q    You testified that you did not receive the termination

11    letter from -- VMC letter by the time when one of plaintiff

12    told you that she was suing VMC, correct?

13    A    I don't remember whether I received it or not.  However,

14    I had no plan to bring a lawsuit at that time.

15    Q    When did you receive your suspension letter, or

16    termination letter from VMC?

17    A    August 29th.

18    Q    When did (indiscernible) inform you about Mr. John Troy?

19    A    Should be prior to me preparing to bring the lawsuit.

20    Prior to that.

21    Q    You mentioned that you were preparing to bring a lawsuit.

22    When did you start to prepare to bring your lawsuit against

23    VMC?

24    A    Middle of September.

25    Q    Did you submit to the -- did you submit to the court

                         Leung - Cross                        28

1      before that you're looking for an attorney through a newspaper

2      on or about September of 2016?

3      A     Yes.

4      Q     And did you submit to the court under sworn testimony

5      that you saw John Troy's legal ads on *Sing Tao* newspaper?

6      A     Either one.  Either *Sing Tao* or *Journal* newspaper.

7      However, I do subscribe to the *Sing Tao* Newspaper.  And

8      occasionally, I would buy *World Journal* newspaper.

9      Q     You're not responding to my question.  You can say yes or

10     no to my question.

11         Did you testify, or did you make a statement under oath

12     saying that you saw John Troy's legal ads on *Sing Tao*

13     newspaper?

14     A     Possibly at the time I only mentioned *Sing Tao*.  *Sing*

15     *Tao, World Journal*.  But I think at the time I only mentioned

16     *Sing Tao*.

17              MR. YAM:  Your Honor, if I may?  This was further

18     clarified in the reply memorandum and affidavit that she

19     admits that it's the *World Journal* and we attached a newspaper

20     clipping.

21              THE COURT:  I understand.

22     BY MR. BYUN:

23     Q     Where did you see Mr. Troy, or Attorney John Troy's ads

24     on newspaper?  Which newspaper did you see his legal ad?

25     A     It's either *Sing Tao* or *World Journal*.  If it's not the

1    *World Journal*, then it's the *Sing Tao* newspaper.

2           MR. BYUN:  We request to enter this document --

3    enter into evidence.  This was submitted as evidence.

4           THE COURT:  Thank you.  All right.  Could I get

5    counsel at sidebar?

6    (On the record discussion at sidebar with Mr. Byun and Mr.

7    Yam.)

8           THE CLERK:  Judge, do you want the --

9           THE COURT:  Yeah.  Well, actually, I don't think we

10   need it.

11          THE CLERK:  No?

12          THE COURT:  At this point.  (Inaudible.)

13          So, where are we going with this?

14          MR. BYUN:  There is issue of (inaudible).

15          THE COURT:  They don't dispute that.  They don't

16   dispute that.

17          MR. TROY:  I don't dispute that.  I (inaudible).

18          MR. BYUN:  Your Honor, there is issue about the news

19   submission, about newspaper she said that she saw that

20   newspaper ad from September and we have some evidence to prove

21   that that's not possible.

22          THE COURT:  Okay.  Well, let's assume that's true.

23   What's the ultimate point, though?

24          MR. BYUN:  I mean, there is a serious issue about

25   Ms. Leung's credibility and --

Leung - Cross                                                   30

1              THE COURT:  Okay.

2              MR. BYUN:  -- it is my duty to prove that her

3      testimony is not credible.

4              THE COURT:  But let's say she found -- she's already

5      said she heard about Mr. Troy from one of the tour guides.

6      She said she saw it from the newspaper.  If she's mistaken, or

7      wrong about a newspaper is that critical to your case?  Is

8      that a very important point?  I mean --

9              MR. BYUN:  There are not many documents.  As you

10     know, Your Honor, there are not many documents at all.

11     Evidence that is presented for this motion -- only thing that

12     they submit is her affidavit, her testimony alone.

13             THE COURT:  But she's already said that she was

14     wrong about the (inaudible).  I'm concerned about the

15     substance (inaudible).

16             MR. BYUN:  Sure.

17             THE COURT:  She was duplicative --

18             MR. BYUN:  I will (inaudible).

19             THE COURT:  Okay.  You can show that if you want

20     because the fact that it's (inaudible) and that she knew who

21     he was (inaudible).

22     (End of discussion at sidebar.)

23             THE COURT:  I don't think you need to mark Exhibit

24     A.  It's already part of the case.  It's part of the docket

25     sheet and he referred to it, so it's already -- you can

                              Leung - Cross                        31

1     certainly refer to it in any submission.

2              MR. BYUN:  Yes.

3     BY MR. BYUN:

4     Q    This is Exhibit A.  It's a submission by you to the court

5     in Docket No. 55-2.

6              Ma'am, do you recognize this document?

7              THE COURT:  You don't need to authenticate it.  I

8     mean, it was a submission.  You made this -- you agree that

9     it's authentic, correct?

10             MR. YAM:  I agree that it's authentic.

11             THE COURT:  It's an exhibit.

12             MR. BYUN:  Yes.

13             THE COURT:  Okay.  In this case.  Okay.

14    BY MR. BYUN:

15    Q    But did you made a sworn statement, a statement under

16    oath, that this was a true copy of a newspaper that you saw on

17    *World Journal* newspaper in September of 2016?

18    A    Possibly, yes.

19    Q    Do you have in custody the original version of this

20    picture?

21    A    No, at the time I took a picture of the address, so I

22    don't need to cut it out to find the address.

23    Q    When did you take this picture?

24    A    Prior to going up to see Attorney Troy.

25    Q    Do you have the original of the newspaper that you took

1    this picture of?

2    A    No.

3    Q    Why did you take this picture?

4    A    Because I need to find him based off this address here.

5    Q    What kind of device did you use to take this picture?

6    A    A cell phone camera.

7    Q    Have you ever pursued any education in English?

8    A    Yes.

9    Q    At where?

10   A    I attended school here in the States.

11   Q    What is your highest education?

12   A    I attended college.

13   Q    What did you study?

14   A    Early childhood education.

15   Q    Can you read a newspaper article in English?

16   A    I understand between 70 to 80 percent, but I feel more

17   comfortable in Chinese.

18            THE COURT:  If she speaks English, you don't have to

19   translate.

20   BY MR. BYUN:

21   Q    Earlier you testified in English using terms conflict of

22   interest.  What's meant by conflict of interest?

23   A    Conflict, whether there's any kind of conflict.

24   Q    Earlier you testify -- first time you visit Mr. John

25   Troy's office, you question to him about possible conflict of

Leung – Cross                                          33

1      interest he may have with you and VMC, correct?

2      A    Because Attorney Troy informed me that there's a ongoing

3      lawsuit with two tour guides.  So, I asked, you are

4      representing them and me.  Will there be any kind of a

5      conflict?

6      Q    Did you use the word conflict, or did you use the word

7      "conflict," or did you use the conflict of interest when you

8      speak with John Troy?

9      A    I used both.

10               THE COURT:  We're going to take a break.

11               THE CLERK:  Okay.  So 4:30 (inaudible)

12               THE COURT:  All right.  We need to interrupt the

13     hearing for just a few minutes.

14               Yes, we'll go off the record.  Before you go off the

15     record, hold on a minute.

16     I'm just going to instruct the witness, we'll place you in the

17     jury room so that you can --

18               THE WITNESS:  Can I go to the bathroom?

19               THE COURT:  It has a bathroom.  You'll like it.

20     It's very nice.

21               Someone want to take her to the jury room?

22               THE CLERK:  The jury room?

23               THE COURT:  The jury room.  It has a bathroom.  It's

24     a good place to go to.

25               (Recess from 4:24 p.m. until 5:19 p.m.)

CONTINUED CROSS-EXAMINATION

BY MR. BYUN:

Q    Ms. Leung.

A    Yes.

Q    You testified earlier that you brought a full -- whole
stack of documents to Mr. Troy's office at the meeting on
September -- it was September 23rd, correct?

A    Yes, every time I go to any attorney I always bring
documents with me.

Q    Did you bought those stack of documents to any other
attorney before you went to Mr. Troy?

A    I have visited other attorneys as well.

Q    When?

         THE COURT:  With those documents?  That was the
question.

         THE WITNESS:  Yes.  Yes.

BY MR. BYUN:

Q    When?

A    September 20th.

Q    That was two days before you met Mr. Troy for the first
time, right?

A    Well, if I saw attorney Troy on the 23rd, then that would
be three days prior.

Q    What was the name of that attorney?

A    Lawyer Hang.

1    Q    Is his name Jian Hang?

2    A    Yes.

3    Q    Did you seek any other attorney other than Mr. Jian Hang

4    before you met John Troy for the first time?

5    A    I've spoken to several over the phone, but not face to

6    face.  And also, they don't handle contingency cases.

7    Q    What are the names of those several attorneys?

8    A    Well, well because they didn't take the case, I don't

9    remember who they are.  And I did not meet them either.

10   Q    So, did you also bring those whole stack of document when

11   you met Mr. Jian Hang?

12   A    I did.  But he didn't read through everything.  And also,

13   I spent less time with him than Attorney Troy.

14   Q    My question is -- you can answer yes or no.  Did you

15   bring those stack of documents.  You could just say yes or no.

16   A    (In English) Yes.  Yes.

17   Q    Thank you.  Was there any other attorney, other than Mr.

18   Troy or Mr. Jian Hang, that you brought those stack of

19   documents to before you met with Mr. Troy?

20   A    No, because within three days I was only able to make two

21   appointments.

22   Q    You just testified you brought that whole stack of

23   documents to several attorneys, but you just testified there

24   was only one.

25   A    Oh, I didn't say how many.  I said more than just

Leung - Cross                                                              36

1    Attorney Troy.

2    Q    How big was this whole stack of documents you just

3    referenced?

4              THE COURT:  I'm just going to interrupt here.  Is

5    this going to be really necessary?  She said that Mr. Troy

6    only looked at two of them, and that's Exhibits 1 and 2, as I

7    recall.  Is that correct?

8              MR. BYUN:  Yes, I --

9              THE WITNESS:  He did glance through the others, but

10   concentrated in these two documents.

11   BY MR. BYUN:

12   Q    When you say he, is that Mr. Troy?

13   A    Yes.

14   Q    You say he glanced through other documents.  What other

15   documents did Mr. John Troy glance through, other than

16   Defendant's Exhibit 1 and Exhibit 2?

17   A    Well, I bought a whole pack -- big stacks of paper with

18   me, including tickets, document related to VMC, within the

19   whole year.

20   Q    Okay, the documents were not separated.  It was in the

21   back.  How did you know that Mr. Troy only looked at just

22   Defendant's Exhibit 1 and Exhibit 2?

23   A    Well, I brought the whole stack of documents with me with

24   these two documents on top, and he said, okay, let me take a

25   look.  Where is your document?  I took them out and then he

1    went through them by one by one by one.  Like that.

2    Q    Let's go to Exhibit 1.  How did John Troy look at the

3    document?  Can you explain it?

4    A    Which one is 1?

5    Q    Defendant's Exhibit 1, the one that you're pointing to

6    there.

7              MR. YAM:  Her copies are not marked, I don't think.

8    BY MR. BYUN:

9    Q    How long did Mr. John Troy look at this document when you

10   brought this document to Mr. Troy?

11   A    I felt that he looked at a lot of stuff, that he

12   understood.  Maybe he spent a little bit more time on the

13   first page.

14   Q    My question was how long did John Troy look at

15   Defendant's Exhibit 1.

16   A    How am I supposed to calculate the time, because he

17   didn't set the time aside to read something in particular.  We

18   spoke, we talked while looking, and looking while speaking.

19   Q    Didn't you testify that he looked at this document longer

20   than other?  Isn't that your testimony?

21   A    He looked through both, this one and the other one.  And

22   the other one is longer.

23   Q    This one, indicating which?  Defendant's Exhibit 2?

24   A    Yes.

25   Q    Why did he only look at these two documents?

Leung - Cross                                             38

1    A    Because whether to bring a lawsuit or not, all depends on

2    contract, and the suspension letter.

3    Q    Okay.  When did Mr. Troy tell you that?

4    A    Tell me what?

5    Q    The testimony you just testified, it all depends on this

6    contract and suspension.

7         Didn't you say that Mr. Troy told you that it's all about

8    contract and suspension?  Did he tell you that?

9    A    After he looked at this stuff, that same day he said, I

10   could represent you in the lawsuit.

11   Q    After he reviewed those two documents, Exhibit 1, Exhibit

12   2, and you also testified he glanced at other documents that

13   you brought to his office.

14   A    Should be, yes.

15   Q    And how long did it take -- did it take for Mr. Troy to

16   look at Exhibit 1 and Exhibit 2, and those document that he

17   glanced?

18   A    Well, the entire process is about an hour, plus while we

19   had a conversation talking and reading at the same time, one

20   after the other.

21   Q    Okay.  My question was, how long did Mr. Troy took to

22   look at --

23             THE COURT:  Do you know?  Do you know the answer to

24   that question?

25             She doesn't know the answer.

1    BY MR. BYUN:

2    Q    But how do you know it took one and a half hour for

3    entire process?

4    A    Because I checked the time.  I mean, I checked the time.

5    I had an appointment at a certain time.  When I left, I looked

6    at the time.

7    Q    But how did you --

8              THE COURT:  Excuse me.  I think we're going into the

9    weeds here.  I think you've made whatever point you wanted to

10   make and you need to move on.

11             Are you saying that your entire -- the entire

12   appointment you had with Mr. Troy lasted an hour, an hour and

13   a half?  Is that what you said?  And during some part of that

14   time he looked at those two documents?

15             THE WITNESS:  Actually, more time was spent on the

16   discussion between us.

17             THE COURT:  So do you have any more questions of

18   this witness?

19             MR. BYUN:  Yes, Your Honor.

20             THE COURT:  A few minutes ago you said you had 10

21   minutes.  About 15 minutes ago you said you had about ten

22   minutes left.  I would have liked to hear Mr. Troy's

23   testimony.

24             MR. BYUN:  Yeah, I would assume it's ten minutes

25   more.

1          MR. YAM:  Your Honor, I would like to examine Mr.

2     Troy as well.  I don't think he's going to get any more.  He's

3     asking basically repeat questions, I feel.

4          THE COURT:  What more are you --

5          MR. BYUN:  Yes, Your Honor.

6     BY MR. BYUN:

7     Q    Earlier you testified when you meet at Mr. Troy's office

8     for the first time, you mentioned that -- you testified, you

9     talk about something called K & F Travel.  Why did you discuss

10    about Mr. Troy about K & F Travel when you visit John Troy's

11    office for the first time?

12    A    Because Attorney Troy informed me that he represents two

13    tour guides of -- two tour guides, and is suing VMC and is

14    suing K & F.

15    Q    But then when did you discuss about K & F Travel?

16    A    Because he asked me about the relationship between VMC

17    and K & F, and it was during the process of me trying to

18    formulate a lawsuit.

19    Q    Does John Troy mention the term K & F Travel during the

20    first meeting?

21    A    Yes, he mentioned that he is suing VMC and K & F.

22    Q    During the September meeting?

23    A    Yes.

24    Q    Why did you -- earlier you testified that you went to

25    John Troy's office with someone else, correct?

Leung - Cross                                                41

1    A    Yes.

2    Q    And that also you testified that individual's name is

3    Cindy Low.

4    A    Yes.

5    Q    Why did you go to the lawyer's office with Cindy Low?

6    A    Well, first of all, I felt that she knew about the matter

7    and is a fair person, and also lives in Flushing.  And I'm not

8    as familiar as her about Flushing, so I wanted somebody to

9    accompany me.

10           THE COURT:  About what?  Not familiar about what?

11           THE INTERPRETER:  Flushing.

12           THE COURT:  Oh.

13           THE INTERPRETER:  The location, Flushing.

14   BY MR. BYUN:

15   Q    Second time you visited John Troy in October, did you

16   also go there with Cindy Low?

17   A    Yes.

18   Q    Have you ever visited your current attorney's office with

19   Cindy Low?

20   A    Yes.

21   Q    Where is your current attorney's office located?

22   A    207 Bowery (ph).

23   Q    That's not Manhattan.  That's in Manhattan, not Flushing,

24   correct?

25   A    Correct.

Leung - Cross                                                    42

1    Q     Why did you bring Ms. Cindy Low to your current attorney?

2    A     Just in case I forget something.  And also, she knew the

3    whole matter because she already accompany me to two separate

4    attorneys.

5    Q     When was the first time you visited your current

6    attorney's office?

7    A     The first time I went was during the same period that I

8    informed you when I was looking through a whole bunch of

9    alternative attorneys at that period.

10   Q     Around September of 2016, correct?

11   A     Could be yes, maybe, but I'm not sure because he's not

12   willing to take on any contingency.

13   Q     He -- are you referencing to your current attorney,

14   correct?

15   A     But it was after I visited the Attorney Troy that I

16   really went to them to really seriously discuss the case.

17   Q     Was it somewhere around the September to October of 2016?

18          THE COURT:  She already testified it was September.

19          MR. YAM:  Your Honor, I'm not sure we can finish

20   before 6 o'clock in terms of examination of Mr. Troy.  I'm not

21   sure how Your Honor would like to proceed with this matter.

22          THE COURT:  Well, I'd like to finish this witness.

23          MR. YAM:  Okay.

24   BY MR. BYUN:

25   Q     Ma'am --

Leung - Cross                                                43

1           THE COURT:  Remember, what I'm concerned with is

2     what the witness said to Mr. Troy and what Mr. Troy said to

3     the witness; what really happened.  I'm less concerned --

4     just, some of the side issues.

5           MR. BYUN:  Yes, I --

6           THE WITNESS:  I want to add something.

7           THE COURT:  You can only answer in response to a

8     question.  I'm sorry.

9     BY MR. BYUN:

10    Q    When you visited John Troy's office, you accompanied with

11    Cindy Low, did you know that Ms. Cindy Low was also employee

12    of VMC, or former employee of VMC?

13    A    (In English) She know VMC.  She know the place.

14    Q    And earlier you also testified, when you visited Mr.

15    Troy's office, that you had concern about conflict of interest

16    because Mr. Troy was representing VMC's employee, correct?

17    A    (In English) Yes, Cindy is not suing anybody.  Not suing

18    VMC or K & F, or anybody.  So she has no conflict.  Why I have

19    to worry about that part?

20          THE COURT:  Okay, I think we can move on to another

21    issue.  I think you've made your point.

22          MR. BYUN:  Your Honor, plaintiff move to strike for

23    nonresponse (inaudible).

24          THE COURT:  Denied.  Overruled.

25    BY MR. BYUN:

Leung - Cross                                    44

1    Q    What did you know about this plaintiff views  -- working

2    hour, and wages at VMC?

3                THE COURT:  How is that relevant?

4                MR. BYUN:  She -- her affidavit is stating that

5    there was one issue that she discussed with John Troy at the

6    first meeting.

7                THE COURT:  But she testified earlier here today

8    that she didn't discuss those issues with him.  And now you're

9    opening the door to weakening your case by asking questions on

10   cross-examination --

11               MR. BYUN:  Yes, Your Honor. I withdraw the question.

12   BY MR. BYUN:

13   Q    Did you discuss any case strategy with John Troy in

14   October 8, 2016?

15   A    Yes.

16   Q    What kind of case strategy did you discuss with John Troy

17   on October 8th, 2016?

18   A    When I went up there Attorney Troy informed me that yes,

19   he can represent me and bring the lawsuit.

20        (In English)  And then, the reason why I remember October

21   8 this much, okay, because on that day Mr. Troy spent a lot of

22   time on the computer (in Chinese) wi-fi.  Why I -- I'm sorry.

23   I'm in Chinese.  Because at the end Mr. Troy said today is

24   Saturday.  He swear mean to me.  Today is Saturday.  I came

25   out just specially for this case.

1        And if I know that you're not going to bring lawsuit

2    then I wouldn't even bother to show up because I don't see

3    clients or people.  I don't see people on Saturdays.  And

4    that's the reason I remember in particular that was a

5    Saturday.

6    Q    That's not a response to my question.  My question was,

7    what kind of -- I will ask another question.

8        What kind of case strategy did you discuss with John Troy

9    in October 8th, 2016?

10   A    Well, Attorney Troy informed me that I can sue for breach

11   of contract.  I'm a middleman, I'm a broker.  He mentioned

12   that to me several times.

13   Q    That was after Mr. Troy was mean to you, yelling at you

14   hysterically?

15              THE COURT:  Do you understand that?

16              MR. BYUN:  There's no objection.

17              THE COURT:  Well, was mean to you?  There's --

18   that's not a proper question.

19              MR. BYUN:  Okay.

20   BY MR. BYUN:

21   Q    You said Mr. Troy was -- you testified Mr. Troy was not

22   happy that you show up on Saturday.

23   A    (In English) No, he's not happy that I did not decide to

24   sue that day.

25   Q    Uh-huh.  Was that, his expression that he was not very

Leung - Cross                                      46

1   happy, was it before you discussed with the case thoroughly,

2   or after you discussed with Mr. Troy, the case thoroughly?

3   A    Just before I left, when he realized I was not going to

4   sign, not going to do it that day.

5   Q    What time was that, that -- withdrawn. So, how long did

6   you discuss with John Troy about the case strategy?

7            THE COURT:  Asked and answered.  Case strategy, or

8   just the whole -- the strategy?

9            MR. BYUN:  Yeah, the case strategy.

10  BY MR. BYUN:

11  Q    How long about case strategy?

12  A    All together it was about an hour that day, and we didn't

13  divide exactly how much time for what topic.

14           THE COURT:  You can ask any questions you want, but

15  you have only eight minutes left --

16           MR. BYUN:  Sure.

17           THE COURT:  -- in your cross, and then you're done.

18           MR. BYUN:  No further questions.

19           THE COURT:  Okay.

20           MR. YAM:  Your Honor, I'm not sure how you want to

21  proceed right now.  We have eight minutes left.  Do you want

22  to do the direct and cross of Mr. Troy at a separate date

23  or --

24           THE COURT:  I think we're going to have to do it on

25  a separate date.  I don't think we can --

1          MR. YAM:  Okay.

2          THE COURT:  -- do it.

3          MR. YAM:  Can we set the schedule today?

4          THE COURT:  We'll have to.

5          MR. YAM:  Yeah.

6          THE COURT:  Thank you very much.

7       (Witness excused.)

8          THE COURT:  Can we do it tomorrow at 12:00 and just

9    finish up, because I'm very short on time.  It's difficult to

10   find the time.

11         MR. YAM:  Can you just give me one second, Your

12   Honor?

13         MR. BYUN:  Your Honor, we have the settlement

14   conference, 2:30 at Southern District Court.

15         THE COURT:  I'll get you out by 2:00.

16         MR. BYUN:  Huh?

17         THE COURT:  You'll leave at 2:00.  You can leave

18   here at 2 o'clock.

19         MR. YAM:  Can we start tomorrow morning early, at

20   9:30 or 10:00?

21         THE COURT:  No, because I've got a full calendar.

22         MR. YAM:  And what's the time frame that you're

23   looking at?  I could do Friday.  I am free Friday.

24         THE COURT:  All right.  What do you have?  Do you

25   have something scheduled at noon?

48

1          MR. YAM:  At noon, no, but I have something in 3

2     o'clock in White Plains, a status conference.

3          THE COURT:  How long does it take to get to White

4     Plains from here?

5          MR. YAM:  I don't know, like two -- from here?  Two

6     -- at least two hours, because I've got to get to the Metro

7     North and then I've got to go up all the way.  That's if

8     there's no traffic.  I really can't tell.

9          THE COURT:  All right.

10          MR. YAM:  I really prefer to do it in the morning as

11     early as possible, or Friday.  I'm free Friday, all day.

12          THE COURT:  Friday doesn't work.

13          MR. YAM:  Okay.

14          THE COURT:  Friday is fuller than tomorrow.  I have

15     one thing.

16          MR. BYUN:  Your Honor, why don't we just finish

17     today?  Stay another 30, 40 minutes.

18          MR. YAM:  Overtime.

19          THE COURT:  We can't.  We can't.  I'm not available

20     to do it tonight.

21          MR. YAM:  Your Honor, if it's tomorrow, what time

22     are you available?  I could get my partner to come.  Someone

23     else from my firm who is familiar with the case.

24          THE COURT:  Does that work for you?

25          MR. YAM:  I think that would be better because I

49

1    don't want to miss -- White Plains, I can't tell with the

2    travel.  So, if it's something that can fit with the time in

3    their time, I --

4              THE COURT:  What time do you have to leave here

5    tomorrow?

6              MR. YAM:  For White Plains?  I honestly don't know.

7    I haven't mapped it out yet.  I haven't done the -- I haven't

8    checked the schedules.

9              THE COURT:  12:00 or 12:30?  12:30?

10             MR. YAM:  If it's 12:00 or 12:30, if it's that tight

11   I might get my partner to come.  My partner is familiar with

12   this case as well.

13             THE COURT:  Okay.

14             MR. BYUN:  That's tomorrow?

15             MR. YAM:  That's what the judge is saying.

16             MR. BYUN:  No, which day?

17             MR. YAM:  Tomorrow.  Tomorrow.

18             MR. BYUN:  No, Your Honor, we cannot do it tomorrow

19   because he has -- John Troy has deposition too.

20             THE COURT:  Well, you just said it would be okay.

21   You had a 2:00 o'clock settlement conference.

22             MR. BYUN:  No, I did not say that.

23             THE COURT:  Someone said there was --

24             MR. YAM:  You were -- he's available.  Mr. Troy is

25   available.

50

1          MR. TROY: Me, yeah.

2          MR. YAM:  If my partner can come, I'm available.  I

3     mean, my partner will be available all day.

4          THE COURT:  Okay.  So, Mr. Troy, you're available

5     when tomorrow?

6          MR. TROY:  I have settlement conference 2:30 in

7     Manhattan.

8          THE COURT:  So, you're available in the morning?

9          MR. BYUN:  I have a deposition all day.

10         THE COURT:  You have a deposition when?

11         MR. TROY:  He have deposition all day.

12         THE COURT:  Okay.

13         MR. TROY:  So, he should be there, I mean that time,

14     if now you can set for it.  If not, for this case we can set

15     for it.  Can we do it Friday?

16         THE COURT:  Well, Friday is hard.  Let me see if I

17     can somehow arrange it.

18       (Pause.)

19         THE COURT:  All right.  We could do it at 1:30 on --

20     1:30 on Friday.

21         MR. YAM:  1:30 on Friday is fine with the

22     defendants.

23         MR. TROY:  That's good.

24         MR. BYUN:  Yes, that works for plaintiff as well.

25         THE COURT:  Okay.  All right.  I'll see you then.

1      Don't forget the witness in the witness room.

2              MR. TROY:  Oh, okay.  Yeah.

3              MR. BYUN:  Is she going to testify?

4              MR. TROY:  No, Judge, we've got to -- I don't know

5      how can she get precluded for continuance.

6              THE COURT:  I'm sorry?

7              MR. TROY:  Okay, Your Honor, I believe you've got --

8      all the witness cannot talk with the parties and I don't think

9      -- Mr. Kevin Young is her attorney too.  So, she has been

10     preclude, and how can we continue for, with this?  So, maybe

11     you've got to give an order to direct if she want to be a

12     witness.

13             THE COURT:  Are you going to call her as a witness?

14             MR. BYUN:  At this point, I really don't think -- I

15     mean, it's --

16             THE COURT:  She doesn't have anything to add, does

17     she?  I mean --

18             MR. YAM:  I mean, she has nothing to add.  I mean,

19     he really went through the whole nine yards with her.  I think

20     it's just what Mr. Troy has to say.

21             I mean, if we do call her as a witness, instead of

22     her appearing -- because she had to take off from work today.

23             THE COURT:  Yeah.

24             MR. YAM:  Can we just do a telephone conference?

25     Otherwise, I don't think she'd be able to take -- so, okay.

1    I'm not sure if -- I have to see her availability on Friday

2    because I'm not sure if she can make it.

3              THE COURT:  Well, she can't testify by phone.  If

4    you want her as a rebuttal witness --

5              MR. YAM:  Okay.

6              THE COURT:  I just don't know what she would add.

7              MR. YAM:  Right.

8              THE COURT:  Would she say anything different from

9    what your witness said?

10             MR. YAM:  Nothing, but Mr. Troy is saying that she

11   did not appear on the second conference.  And Mr. Troy stated

12   in his papers that she did not -- Ms. Low was not present for

13   the conversation.

14             THE COURT:  Uh-huh.

15             MR. YAM:  So.

16             THE COURT:  And she's going to testify that she was.

17             MR. YAM:  Yes.

18             THE COURT:  Okay.  Well --

19             MR. YAM:  I mean, if she has to come, she has to

20   come, so.

21             THE COURT:  I don't know what Mr. Troy is going to

22   testify to.

23             MR. YAM:  So, it's 1:30 on Friday, right?

24             THE COURT:  Yes.

25             MR. YAM:  Okay.  Thank you, Your Honor.

1                THE COURT:  Would 2:00 be better for her, or

2     wouldn't make a difference?

3                MR. YAM:  1:30, 2:00, doesn't make a difference.

4                THE COURT:  Okay.

5                MR. YAM:  Thank you.  Thank you, Your Honor.

6          (Proceedings concluded at 5:56 p.m.)

7

8                I, CHRISTINE FIORE, Certified Electronic Court

9     Reporter and Transcriber, certify that the foregoing is a

10    correct transcript from the official electronic sound

11    recording of the proceedings in the above-entitled matter.

12

13    *Christine Fiore*

14    _____          July 3, 2017

15        Christine Fiore, CERT

16

17

18

19

20

21

22

23

24

25